NOT FOR PUBLICATION                          [Dkt. Ent. 50]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

---

ANGELA PAPP,

     Plaintiff,

        v.

MRS BPO LLC; MRS ASSOCIATES,
INC.; REGINA WEIR,

     Defendants.

---

Civil Action No. 13-3183

**OPINION**

Appearances

Caren N. Gurmankin, Esquire
Console Law Offices LLC
110 Marter Avenue, Suite 105
Moorestown, New Jersey 08057
    Attorney for Plaintiff

Linda G. Harvey, Esquire
Greenberg, Dauber, Epstein & Tucker, PC
One Gateway Center - Suite 600
Newark, New Jersey 07102-5311
    Attorney for Defendants MRS BPO LLC, MRS Associates, Inc.,
    and Regina Weir

**BUMB**, United States District Judge:

This matter comes before the Court upon a motion for

summary judgment filed by Defendants MRS BPO LLC ("MRS BPO"),

MRS Associates, Inc. ("MRS Associates," and with MRS BPO, the

"MRS Defendants"), and Regina Weir, Chief Personnel Officer of

MRS BPO.  [Dkt. Ent. 70.]  For the reasons set forth below, the

Court denies the MRS Defendants' motion for summary judgment regarding the retaliation and hostile work environment claims. The Court grants Defendant Weir's motion for summary judgment on Plaintiff's claim that Ms. Weir aided and abetted the alleged conduct of the MRS Defendants.

## I.   Factual Background

Plaintiff has been employed as a recovery agent with MRS BPO in Cherry Hill, New Jersey since July 2010.[1]  (Defs.' Statement of Facts ("DSOF") and Plaintiff's Response ("PR") at ¶ 2; Defs.' Ex. 41.)  In that capacity, Plaintiff collects delinquent student loan debts by making contact with borrowers, discussing their loan obligations and negotiating payments they are able to make.  (Plaintiff's Statement of Facts ("PSOF") and Defendant's Response ("DR") at ¶ 7.)

In early 2011, Plaintiff began reporting to Wilson Bunton, who then served as a Manager of Operations for MRS BPO, managing a team of student loan recovery agents that included Plaintiff. (Id. at ¶ 5; Weir Dep. 180:7-10.)  Prior to managing Plaintiff's group, Mr. Bunton and Plaintiff were co-workers, (Papp. Dep. 16:5-8), and by both Plaintiff's and Mr. Bunton's accounts, the two were friends during at least a portion of the time they have

---

[1] The parties disagree on whether Plaintiff was also employed by MRS Associates during this time.  MRS BPO is 95% owned by MRS Associates and 5% owned by Spanco, an Indian company.  (Freedman Dep. 39:16-21.)

been employed together. (Bunton Dep. 141:11; Papp Dep. 34:9-18.)
Nevertheless, Plaintiff contends that around February 2012,
after she told Mr. Bunton that she was having personal problems
at home concerning her daughter and marriage, Mr. Bunton began
making inappropriate sexual comments and advances toward her.
(PSOF at ¶ 18.)  Specifically, between February and October
2012, Plaintiff testified at her deposition that on sixteen
occasions Mr. Bunton engaged in behavior including telling
Plaintiff he was attracted to her, making off-handed sexual
remarks, showing Plaintiff an explicit photograph of himself and
asking Plaintiff to engage in various sex acts.  (See Pl.'s Br.
at 6-7.)  Although the alleged sexual harassment began in
February or March 2012, neither party disputes that Plaintiff
did not report it to high-level management or the Chief
Personnel Officer, Ms. Weir, during the time in which Plaintiff
worked in the group managed by Mr. Bunton.  (DSOF & PR at ¶ 58.)[2]

On December 5, 2012, an altercation occurred between Mr.
Bunton and Plaintiff.  Plaintiff approached Mr. Bunton at his
desk, hoping to discuss an account that was moved from Plaintiff

_____

[2] Plaintiff contends that part of the reason she elected not
to discuss the issue with anyone in management at MRS Defendants
was that "[Mr. Bunton] made it very clear if I went to HR, the
first thing they would do was remove me from his group.  He also
stated that they would side with him no matter what, because he
was their golden boy, and they would always side with their
managers over a collector."  (Papp Dep. 45:5-11.)

to another collector.  (Papp Dep. 19:12-19.)  Another employee
was sitting with Mr. Bunton, and Mr. Bunton told Plaintiff to
wait to speak with him.  (Id. at 19:21-25, 20:18-25-21:1-2.)
According to Plaintiff, she then cursed directly at Mr. Bunton,
(Papp Dep. 21:3-17), and, as she explained at her deposition,
"under my breath I believe I may have cursed on my way to my
desk something like, you don't have to be such an [expletive]."
(Id. at 20:5-7.)  Mr. Bunton immediately left his desk and
became very upset with Plaintiff, raising his voice at her and
placing his finger in her face.  (Id. at 20:10-14; Bunton Dep.
148:11-16.)  Plaintiff slapped Mr. Bunton's hand away from her
face and, according to her own account, said, "[G]et your
[expletive] hand out of my [expletive] face."  (Papp Dep. 20:
14-15.)  Immediately after this altercation, Mr. Bunton went to
Human Resources to report the incident.  (Id. at 20:15-17; Bunton
Dep. 148:23-24.)  As a disciplinary action, Ms. Weir instructed
Plaintiff to go home for the day "to calm down."  (Weir Dep.
92:9-11; Papp Dep. 21:18-20; 22:17-22.)

    On Friday, December 7, 2012, Plaintiff met with Ms. Weir
and Mr. Bunton concerning the December 5, 2012 incident.  At
that time, although it is disputed on exactly whose authority
the decision was made, (Weir Dep. 125:1-4; Bunton Dep. 176:18-

180:22; Papp Dep. 23:8-18),[3] the decision was reached that Plaintiff would be reassigned to a different group.  Over the weekend, Plaintiff expressed her disappointment with this decision and her desire to remain in Mr. Bunton's group to a co-worker.  (DSOF & PR ¶ 21.)  The following Monday, December 10, 2012, Plaintiff was assigned to a different team, led by Tabitha Radie. (Weir Dep. 171:21-24.) Plaintiff remained at her current title, working the same type of loans, with the same day-to-day responsibilities.  (Defs.' Ex. 23.) Plaintiff is now the only student loan collector in her group, which is a change from Mr. Bunton's group.  (Papp Dep. 32:5-33:21.)

On December 18, 2012, Plaintiff filed an EEOC charge against MRS BPO detailing Mr. Bunton's sexual harassment against her.  In the charge, Plaintiff listed the instances in which she was subject to sexual harassment by Mr. Bunton and described the December 5, 2012 altercation.  (See Pl.'s Ex. 12.)  Plaintiff subsequently filed two additional EEOC charges.[4]

---

[3] Specifically, Ms. Weir contends that the decision to transfer Plaintiff was made because Mr. Bunton recommended that she be moved from his group.  (Weir Dep. 92:9-11.)  Mr. Bunton claims he does not know who decided to transfer Plaintiff from his group, (Bunton Dep. 183:19-20), but he disagreed with the decision, (id. at 183:2-14.)  Plaintiff testified that the decision was made at the meeting by Ms. Weir based on Mr. Bunton's recommendation.  (Papp. Dep. 23:8-18.)

[4] On January 7, 2013, Plaintiff filed a second EEOC charge, alleging she was discriminated against in the form of Ms. Weir's conduct toward Plaintiff during the course of the investigation of her claims.  (Pl.'s Ex. 16.)  On February 19, 2013, Plaintiff

In the wake of Plaintiff's first EEOC charge, the MRS Defendants, through Ms. Weir, began an investigation of the alleged harassment.  On December 20, 2013, Ms. Weir spoke with Mr. Bunton concerning the allegations.  (Weir Dep. 147:24-148:6.)  Ms. Weir additionally spoke with various employees at MRS BPO concerning the allegations and kept general, handwritten notes of her meetings.  (Pl.'s Ex. 23.)  Although no employee directly corroborated any of the harassment allegations that Plaintiff filed, one employee did indicate an experience in which she felt "creeped out" by Mr. Bunton.  (Id.)  Ultimately, despite speaking with several employees, no conclusion was ever reached concerning whether the allegations were true.  (Weir Dep. 97:22-98:1.)  At the conclusion of the investigation, Ms. Weir testified that she addressed the harassment allegations with Mr. Bunton,[5] but he was never formally disciplined by Ms. Weir or the MRS Defendants concerning the alleged conduct.  (Id. 96:14-19.)

---

filed a third charge of discrimination alleging that she had been warned for an issue that she had never been disciplined for previously, that she was being ignored by management, and that calls were not being transferred to her after her change of groups.  (Pl.'s Ex. 17.)  Plaintiff also alleged further deficiencies in the investigation of her claims.  (Id.)

[5] Mr. Bunton disputes that the individual allegations were discussed with him or that Ms. Weir asked him questions about the allegations, although he admits that he did not remember "anything generally" about what they discussed.  (Bunton Dep. 266:1-270:15.)

Plaintiff testified during her deposition that, despite a promise from MRS Defendants that her employment conditions would be the same after her transfer to a different group, she now faces a more challenging environment in which to do her job. According to Plaintiff, because she is now the only student loan collector in her current group and members of her group often leave early and are unable to receive calls when she is out, the structure of compensation now results in getting fewer fees or more often having to share fees with other collectors.[6]  (Papp Dep. 26:4-29:15.)  Plaintiff also testified about her feelings of alienation because she was placed into a collection group where she is less comfortable with her co-workers.  (Id. at 63:18-65:14.)

On April 10, 2013, Plaintiff's counsel wrote to the EEOC withdrawing her charges of discrimination and indicating her desire to proceed in court.  (Pl.'s Ex. 38.)  On May 20, 2013, Plaintiff filed the Complaint in this action with the Court. [Dkt. Ent. 1.]  On February 6, 2015, all defendants moved for summary judgment.

---

[6] Undermining this to a degree is the fact that Plaintiff has actually made more money since her transfer.  (DSOF & PR ¶ 75.)  Plaintiff contends that this is because she has "had to fight tooth and nail the entire way" to ensure the transfer did not impact her earnings.  (Papp Dep. 30:8-14.)

## II.   Legal Standard

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." 14 Fed. R. Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  Id.

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252.  Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 373, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

## III.   Analysis

### A. Plaintiff's Employer

As a threshold matter, MRS Associates argues that it should be granted summary judgment on all claims against it because it is not actually Plaintiff's employer.  (Defs.' Br. at 40.)

Plaintiff disputes this fact and has pointed to documents in the record suggesting that MRS Associates was also Plaintiff's employer.  (Pl.'s Opp. Br. at 39-40; see also Pl.'s Ex. 1 (outlining Plaintiff's participation in the MRS Associates Employee 401(k) plan); Pl. Ex. 33 (form signed by Plaintiff acknowledging she had received an MRS Associates employee handbook); Pl.'s Ex. 34 (covenant not to compete with MRS Associates signed by Plaintiff and begun with the phrase "Due to MRS Associates, Inc's extensive investment in training its employees . . . .").

Although the parties do not structure their argument around the factors governing when an employer-employee relationship exists under the NJLAD, these govern whether such a relationship exists: "(1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation- supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the 'employer;' (10) whether the worker accrues retirement benefits; (11) whether the 'employer' pays social security taxes; and (12) the intention of the parties."  Plaso v. IJKG, LLC, C.A. No. 11-5010, 2013 WL 2182233, at *4 n.5

(D.N.J. May 14, 2013) (quoting Pukowsky v. Caruso, 312 N.J. Super. 171, 182-83 (App. Div. 1998)).

MRS Associates points to Plaintiff's W-2 forms from MRS BPO, which provide support only for the notion that Plaintiff was paid by MRS BPO (which is undisputed), but not that she was solely employed by MRS BPO.  See Kurdyla v. Pinkerton Sec., 197 F.R.D. 128, 135 (D.N.J. 2000) ("[A] person may be an employee of multiple employers").

Plaintiff has pointed to a string of documents dating back to her hiring and ranging from retirement documents referring to the MRS Associates 401(k) plan (for which she was eligible), to non-compete agreements signed by Plaintiff with MRS Associates. Indeed, MRS Associates appears to have been involved in Plaintiff's requests for time off, (Defs.' Ex. 22.), and her sexual harassment training, (Defs.' Ex. 46.)  Most importantly, Plaintiff has provided evidence that MRS Associates is the majority owner of MRS BPO, which gives it the right to control MRS BPO, and therefore Plaintiff.  See generally Kurdyla, 197 F.R.D. at 135 (noting that at the motion to dismiss stage "the allegation that [one employer] controls [another employer's] activities leads to the inference that it controls plaintiff's activities as well."); see also Alston v. Monmouth County Prosecutor's Office, C.A. No. 12-5633, 2014 WL 1095716, at *9 (D.N.J. March 19, 2014) ("The most important of these factors is

11

the employer's right to control the means and manner of the worker's performance.").

When granted all reasonable inferences from the record assembled, Plaintiff has pointed to evidence from which a jury could reasonably determine she was also employed by MRS Associates during the relevant time period. Accordingly, summary judgment for MRS Associates based upon its argument that Plaintiff was not employed by them is improper.

### B. Retaliation

The MRS Defendants argue that summary judgment is additionally warranted on Plaintiff's claim for retaliation under the LAD because Plaintiff has not established that she suffered an adverse employment action after Plaintiff provided a copy of her December 18, 2015 EEOC to the MRS Defendants. (Defs.' Br. at 15-18.) The MRS Defendants contend prior to that date any alleged protected activity was either (1) not protected activity under the NJLAD or, (2) unknown by the MRS Defendants.

To make out a prima facie claim of retaliation under the LAD, a plaintiff must show: "(1) that [plaintiff] engaged in protected activity; (2) the activity was known to the employer; (3) plaintiff suffered an adverse employment decision; and (4) there existed a causal link between the protected activity and the adverse employment action." Barroso v. Lidestri Foods, 937

F. Supp. 2d 620, 630 (D.N.J. March 28, 2013) (internal quotation marks omitted).

The traditional burden shifting analysis applies in cases of retaliation under the NJLAD, such that once a plaintiff satisfies its burden to establish a prima facie case, "the defendant must articulate a legitimate, nonretaliatory reason for the adverse employment decision.  Upon defendant's proffer of a legitimate nonretaliatory reason for the challenged adverse employment decision, the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." <u>Barroso v. Lidestri Foods, Inc.</u>, 937 F. Supp. 2d 620, 631 (D.N.J. 2013) (alterations omitted).[7]

---

[7] Defendants do not argue that the adverse employment actions to which Plaintiff was subject are nonretaliatory pursuant to this burden shifting analysis, instead only focusing their motion for summary judgment on whether Plaintiff has established a prima facie case.  (Defs.' Br. at 15-18; Defs.' Rep. Br. at 2-3).  Even assuming Defendants had argued the discipline was non-retaliatory because Plaintiff's transfer was the result of her outburst, the presence of Mr. Bunton—the alleged harasser—and his role in the decision to transfer Plaintiff (after he had earlier threatened that Plaintiff might be transferred), could lead a jury to reasonably doubt that Mr. Bunton's recommendation to transfer Plaintiff was based solely on the fact she had been insubordinate.  <u>See generally</u> <u>Andes v. N.J. City Univ.</u>, 419 Fed. Appx. 230, 233 (3d Cir. 2011) ("To survive summary judgment, the plaintiff need only raise doubt as to the legitimacy of the defendant's proffered reason for its adverse action[.]").

### a. Protected Activity

As an initial matter, it is necessary to determine when Plaintiff first engaged in protected activity known by her employer, as this determines the scope of potential employment actions that could be considered retaliatory. Indeed, "The central element of a retaliatory discharge claim under LAD is that the plaintiff be engaged in a protected activity which is known by the alleged retaliator." Erickson v. Marsh & McLennan Co., Inc., 569 A.2d 793, 804 (N.J. 1990) (quotation marks omitted).

"A person engages in protected activity for purposes of the NJLAD when that person opposes any practice rendered unlawful under the NJLAD." Davis v. Supervalu, Inc., C.A. No. 13-414 (JBS/JS), 2013 WL 1704295, at *4 (D.N.J. Apr. 19, 2013) (internal quotation marks omitted). It is well-established that the filing of a formal complaint with management is not required to engage in protected activity—"informal protests of discriminatory practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges" are also permissible forms of protected activity. Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995); Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990). In this case,

14

the MRS Defendants do not dispute that Plaintiff engaged in protected activity on December 18, 2012 when she provided her employer with a copy of her EEOC complaint, but contend that this was the first instance of protected activity engaged in by Plaintiff. (Defs.' Br. at 16.)  Plaintiff contends that her protected activity began earlier when she rejected sexual advances from Mr. Bunton after the harassment began in February 2012. (Pl.'s Br. at 35-36.)

The Third Circuit has declined to address whether rejection of sexual advances comprises protected conduct in and of itself. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2011) ("We note that the District Court held that the rejection of a sexual advance was a protected activity, and that determination has not been questioned on appeal.  Therefore, we do not need to address it.").  Nevertheless, several district courts in this Circuit, including the District of New Jersey, have reached the issue and determined that rejection of sexual advances constitutes protected activity.  Farrell v. Planters Lifesavers Co., 22 F. Supp. 2d 372, 392 (D.N.J. 1998) (holding that plaintiff's pushing of her co-workers hand off her leg constituted protected activity), rev'd on other grounds, 206 F.3d 271.[8]  This Court agrees with the Farrell court and other

---

[8] See also Straub v. First Media Radio, LLC, C.A. No. 2003-237J, 2005 WL 3158042, at *14 (W.D. Pa. Nov. 28, 2005) ("[T]he

district courts in this Circuit and elsewhere that rejection of sexual advances in the Title VII or NJLAD context, especially on multiple occasions as a part of a larger pattern of alleged sexual harassment, constitutes protected activity.

Moreover, there is a dispute of material fact as to whether the protected activity was known by the MRS Defendants.  The protected activity must be known by the retaliators in this case, "i.e., the decision makers with regard to" the adverse employment action.  Michaels v. BJ's Wholesale Club, Inc., 2014 WL 2805098 (D.N.J. June 19, 2014).  It is unquestionably disputed whether this decision was made by Mr. Bunton or made by Ms. Weir at Mr. Bunton's suggestion.[9]  (See supra n.3.)  As such,

_____

Court also finds that the evidence of the Plaintiff noting her uncomfortableness with meeting McGough in Philipsburg is evidence of a rejection of an alleged sexual advance by McGough and is also protected activity."); Ogilvie v. Northern Valley EMS, Inc., C.A. No. 07-485, 2008 WL 4761717, at *4 (E.D. Pa. Oct. 29, 2008) ("Plaintiff's allegation that he was terminated because of his rejection of Solderich's sexual advances does constitute a protected activity under Title VII."); see also Little v. National Broadcasting Co., Inc., 210 F. Supp. 2d 330, 285 (S.D.N.Y. 2002) ("The majority of courts in other districts have held that an employee's refusal to submit to sexual advances constitutes 'protected activity.' . . .  Sexual harassment by an employer or supervisor is an unlawful practice, and an employee's refusal is a means of opposing such unlawful conduct.").

[9] Defendants argue that it is "without dispute" that "MRS did not know of Bunton's alleged harassment or Plaintiff's rejection of same, until December 18, 2012, when plaintiff provided her filed EEOC Charge to Weir." (Rep. Br. at 4.)  This is beside the point.  Assuming Mr. Bunton did indeed make the decision to transfer Plaintiff and did engage in the conduct

a jury should resolve the issue of whether Ms. Papp's rejection
of sexual advances was known by the person that allegedly
retaliated against her.

### b. **Adverse Employment Action**

Having determined that Plaintiff's protected activity began
upon her rejection of Mr. Bunton's sexual advances, the Court
must then determine if there is a dispute as to whether
employment consequences thereafter amounted to an adverse
employment action.  An adverse employment action is one which
would dissuade a reasonable employee from raising a
discrimination claim.  Drago v. Comm'n Workers of Am., No. MER-
L-3899-02, 2007 WL 92606, at *12 (N.J. Super. App. Div. Jan. 16,
2007) (citing Burlington N. & Santa Fe R.R. Co. v. White, 548
U.S. 53 (2006)).  "While the NJLAD does not provide an
exhaustive list of what constitutes an actionable reprisal or
adverse employment decision and there are no bright line rules
defining an adverse employment action, New Jersey courts have
looked to general cases interpreting Title VII and Civil Rights
legislation in order to determine what constitutes an adverse
employment decision in the context of an LAD retaliation claim."
Jorrin v. Lidestri Foods, Inc., C.A. No. 11-2064 (NLH/AMD), 2013
WL 1316160, at *11 (D.N.J. Mar. 28, 2013).  Generally speaking,

---

Plaintiff accuses him of, he would have obviously known of
Plaintiff's rejection of his advances.

"The LAD does not set forth a general civility code for the American workplace.  Therefore, epithets, insults, rudeness, and even severe personality conflicts are generally insufficient to establish a hostile work environment."  Canale v. State, No. L-1573-10, 2013 WL 3762470, at *8 (N.J. Super. App. Div. July 19, 2013).  Factors relevant to determining whether alleged retaliatory conduct amounts to an adverse employment action include "loss of status, clouding of responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment by other employees." Jorrin, 2013 WL 1316160, at *11.

While some of Plaintiff's perceived adverse employment actions fall into the category of "insults, rudeness and personality conflicts," such as continued limited interaction with Mr. Bunton, being repeatedly asked to participate in HR investigations of her harassment, isolation and receiving a written warning on an unrelated topic, others are sufficient. Specifically, Plaintiff being subjected to threats by Mr. Bunton that she would be removed from his group if she complained about her treatment, (Papp Dep. 45:5-23), and her ultimate transfer to another group, where Plaintiff has testified that on occasion employees did not transfer calls to her and the compensation structure was different and worse, could be found by a jury to be an adverse employment action.  Cf. Durand v. FedEx, C.A. No.

12-cv-7450, 2014 WL 2155371, at *4 (D.N.J. May 22, 2014)
(denying summary judgment where Plaintiff had shown evidence of
a general threat against him, change in employment that resulted
in some lost income and overtime opportunities and hostility
from other employees).  These compensation structure changes are
especially relevant given Plaintiff's status as the sole earner
in her family.  (Papp Dep. 46:14-47:3); see generally Burlington
N. v. Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006)
(explaining that in Title VII, the context of employment action
matters, such that changing a single mother's work schedule
might be more adverse than another employee's).

It should be emphasized that Plaintiff has managed to make
more money since her transfer to another group.  (Defs.' Ex.
41.)  In light of that troublesome fact for Plaintiff's case,
the Court is skeptical that a jury would find an adverse
employment action when Plaintiff has actually done better since
her transfer.  However, Plaintiff's unrebutted testimony that
she has "had to fight tooth and nail the entire way" to ensure
the transfer did not decrease her earnings, coupled with her
testimony concerning missed calls and a change in compensation
structure, renders the factual issue one better resolved by a
jury than the Court on summary judgment.

### C. Hostile Work Environment

The MRS Defendants also argue that they are entitled to summary judgment on Plaintiff's claim under the NJLAD for sexual harassment based on a hostile work environment because the harassment to which the Plaintiff was subject was not "severe or pervasive" as a matter of law.  Sexual harassment based on a hostile work environment "occurs when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environmental becomes hostile." Lehmann v. Toys R Us, Inc., 132 N.J. 587, 601 (1993).  "In order to demonstrate a hostile work environment claim under the LAD, a plaintiff must demonstrate that the harassment (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." Pikowski v. Gamestop, Inc., C.A. No. 11-2732 (FLW), 2013 WL 6498072, at *10 (D.N.J. Dec. 11, 2013) (citing Shepard v. Hunterdon Developmental Ctr., 174 N.J. 1, 28 (2002)).[10]

---

[10] "When the harassing conduct is sexual or sexist in nature, the but-for element will automatically be satisfied. Thus when a plaintiff alleges that she has been subjected to sexual touchings or comments, or where she has been subjected to harassing comments about the lesser abilities, capacities, or the 'proper role' of members of her sex, she has established that the harassment occurred because of her sex."  Lehmann v. Toys Us, Inc., 132 N.J. 445, 454 (1993).

Whether conduct is sufficiently severe or pervasive under the NJLAD "depends on, among other things, whether the conduct is frequent, whether it is physically threatening or merely verbally offensive, and whether it unreasonably interferes with plaintiff's job performance." Anastasia v. Cushman Wakefield, 455 Fed. Appx. 236, 239 (3d Cir. 2011).

Plaintiff has demonstrated whether the conduct she endured was severe or pervasive is in dispute. As an initial matter, the severity of conduct by supervisors is "exacerbated because the supervisor has a unique role in shaping the work environment." Ivan v. Cnty. Of Middlesex, 595 F. Supp. 2d 425, 452 (D.N.J. 2009). While it is true that Plaintiff has demonstrated only minimal evidence that this harassment affected her work performance, (see Papp. Dep. 64:24-65:9), which would certainly be relevant, Devine v. Prudential ins. Co. of America, C.A. No. 03-3971, 2007 WL 1875530, at *24 (D.N.J. June 28, 2008), Plaintiff has demonstrated through her deposition testimony repeated sexual comments and advances from Mr. Bunton directed toward Plaintiff, including his alleged display of a graphic photo of himself to her. The record evidence Plaintiff has pointed to shows that she was subject to consistent, explicit sexual commentary and advances by her supervisor, not just occasional or isolated offhand comments. Stallone v. Camden Cnty. Tech. Schools Bd., C.A. No 12-7356 (RBK/JS), 2013

21

WL 5178728, at *4 (D.N.J. Sep. 13, 2013) ("Discrimination is pervasive when incidents occur . . . with regularity.") Moreover, Plaintiff has testified as to at least one instance in which she was subject to physically threatening behavior by Mr. Bunton when he placed his finger inches from her face while speaking with her.  A jury could decide that this was severe or pervasive such that a reasonable woman would feel the terms of employment were altered.  See id. (holding that supervisor's series of facially gender-based or sexual comments were sufficient to survive summary judgment); Longo v. Purdue Pharm., C.A. No. 14-1204 (FSH), 2014 WL 2800817 (D.N.J. June 19, 2014) (holding that case survived summary judgment with evidence that supervisor discussed sex life with employee, propositioned employee for sex, and took part in recommending employee for termination).[11]

### D. Vicarious Liability

It must be determined the extent to which the MRS Defendants can be held vicariously liable for the actions of Mr.

---

[11] For similar reasons that cause the Court to be skeptical with regard to Plaintiff's retaliation claim, the Court hastens to point out that the entirety of Plaintiff's hostile work environment hinges upon a jury believing her largely uncorroborated narration of Mr. Bunton's conduct.  Nevertheless, the question of whose recollection of events is accurate remains one for the jury, not one for the Court on summary judgment. Plaintiff has narrowly demonstrated disputes of material fact and, thus, summary judgment is not appropriate at this juncture.

Bunton, who is not named as a defendant.  In short, the Court determines that they are indeed liable for Mr. Bunton's conduct.

It is certainly true, as the MRS Defendants contend, that an employer is not generally liable for harassing conduct by co-workers who do not supervise the plaintiff because "employers do not entrust mere co-employees with any significant authority with which they might harass a victim."  Smith v. Exxon Mobil Corp., 374 F. Supp. 2d 406, 421 n.37 (D.N.J. 2005) (quotation marks omitted).  That said, the New Jersey Supreme Court has recently clarified its position on the definition of supervisor for purposes of the NJLAD and articulated that, "[T]he allegedly harassing employee should be considered a supervisor for purposes of [a] hostile work environment claim if either: (1) he was authorized to undertake tangible employment decision affecting [the plaintiff]; or (2) he was authorized by the [employer] to direct her day-to-day work activities . . . ."  Aguas v. New Jersey, 220 N.J. 494, 529 (Feb. 11, 2015).

Whether or not Mr. Bunton directed Plaintiff's daily affairs is disputed.  Defendants concede that Mr. Bunton was the "leader" of the group in which Plaintiff worked.  (Defs.' Br. at 30.)  Mr. Bunton admitted at his deposition that Plaintiff has "reported to him" since fall 2010.  (Bunton Dep. 106:11-16.)  Indeed, the very issue giving rise to the December 5, 2012 altercation between Plaintiff and Mr. Bunton concerned an

account belonging to Plaintiff that Mr. Bunton had moved to
another collector, which Plaintiff wanted Mr. Bunton to move
back.  (Papp. Dep. at 19:12-23.)  In his deposition, Mr. Bunton
stated that it was possible he moved the account Ms. Papp was
concerned about.  (Bunton Dep. 149:16.)  This sort of alleged
day-to-day control is what the Aguas court sought to include, in
addition to the power to hire and fire, when it adopted its
"more expansive" definition of supervisor.  See id. at 528.

### E. Aiding and Abetting

Defendants also argue that Defendant Weir did not aid and
abet any of the alleged harassing conduct by Mr. Bunton.  "In
order to hold an employee liable as an aider or abettor, a
plaintiff must show that (1) the party whom the defendant aids
must perform a wrongful act that causes an injury; (2) the
defendant must be generally aware of his role as part of an
overall illegal or tortious activity at the time that he
provides the assistance; and (3) the defendant must knowingly
provide and substantially assist the principal violation."
Lindsey v. N.J. Dep't of Corrections, 2007 WL 836667, at *16
(D.N.J. Mar. 14, 2007).  Whether a Defendant provides
substantial assistance is determined based upon several factors:
"(1) the nature of the act encouraged, (2) the amount of
assistance given by the supervisor, (3) whether the supervisor
was present at the time of the asserted harassment, (4) the

supervisor's relations to the others, and (5) the state of mind of the supervisor." Albiaty v. L'Oreal USA Prods., Inc., No. L-2650-04, 2009 WL 1562948, at *10 (N.J. Super. App. Div. June 5, 2009).

Here, the only evidence Plaintiff points to regarding Ms. Weir's alleged aiding and abetting is Plaintiff's testimony that she was unwilling to investigate the claims unless Plaintiff provided a registered copy of the EEOC charge or dropped her lawyer, that she would not answer some of Plaintiff's questions in an e-mail exchange concerning the investigative process and that she accused Plaintiff of "lying" in their e-mail exchange about what the other said. (See Pl.'s Br. 37-79; Pl.'s Ex. 20.)

This characterization of Ms. Weir's conduct is disingenuous, as it is clearly undermined by the record. Although Plaintiff repeatedly asserted that Ms. Weir refused to investigate her claims until receiving an EEOC charge or Plaintiff dropped her lawyer, the record establishes that Weir met with Plaintiff's co-workers in an attempt to investigate her allegations soon after her initial meeting with Plaintiff. (Pl.'s Ex. 20, 23.) Moreover, although Plaintiff accuses Ms. Weir of calling her a "liar" during the investigation, the context in which Ms. Weir told Plaintiff she was being "absolutely false and inaccurate" indicates this was in response to Plaintiff's repeated accusations that Ms. Weir was refusing

25

to investigate her claims.  Finally, Ms. Weir's failure to answer some of Plaintiff's questions regarding the investigatory process in their terse e-mail exchanges falls well short of creating a material factual dispute that she knowingly and substantially aided and abetted the primary violation.  Indeed, this conduct is nowhere near the sufficient conduct Plaintiff cites to in <u>E.E.O.C. v. Foodcrafters Distrib. Co.</u>, C.A. Nos. 03-2796 (RBK), O4-2394, 2006 WL 489718, at *8 (D.N.J. Feb. 24, 2006), where the recorded suggested that the aider and abettor was "unresponsive" to pleas to remedy the harassment and that he "participated in the abusive conduct."  <u>Id.</u>  Ms. Weir's failure to answer several of Plaintiff's questions in an e-mail exchange between the two and telling Plaintiff that she had mischaracterized her investigation falls fatally short of the "substantial assistance" required of aider and abettor liability such that no reasonable jury could find that she aided and abetted.

> ### F. <u>Faragher/Ellerth</u> Affirmative Defense

Defendants' argument for summary judgment based upon the recently adopted <u>Faragher/Ellerth</u> affirmative defense is unpersuasive.  A defendant is entitled to this defense when "the plaintiff employee has faced no tangible employment action as a result of her rejection of her harasser's advances or complaints about his harassment," and the employer can show "that it

exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Newsome v. Admin. Office of Court of N.J., 13 F. Supp. 2d 807, 818 (D.N.J. 2000).

Assuming the MRS Defendants could make the threshold showing that no tangible employment action was taken, it is disputed whether the MRS Defendants exercised reasonable care to prevent and to correct promptly sexually harassing behavior. While Ms. Weir testified that she investigated and interviewed employees, a jury could find the measures taken by the MRS Defendants including the MRS Defendants' failure to reach any conclusion as to whether the harassment occurred, (Weir Dep. 97:22-98:1), their failure to create a report of the investigation other than several pages of sparse and unorganized handwritten notes, (Pl.'s Ex. 23), their failure to stop Mr. Bunton from interacting with Plaintiff, and their failure to provide little more than a verbal rundown of the sexual harassment policy to address the allegations of the harassment, (Weir Dep. 96:14-19), was unreasonable. Cf. Jones v. SEPTA, C.A. No. 14-3814, 2015 WL 4746391, at *6 (3d Cir. 2015) (granting summary judgment for defendants on Faragher/Ellerth affirmative defense when defendants "conducted an investigation,

made findings, developed a 'plan of action,' required [harasser] to attend a counseling session, and gave him a demerit on his evaluation.").

Given the above factual dispute, the issue of whether the MRS Defendants acted reasonably to prevent the harassment for purposes of the <u>Faragher/Ellerth</u> defense is a question for the jury, not the Court on summary judgment.

## IV.  Conclusion

In sum, because Plaintiff has demonstrated issues in material dispute concerning her retaliation and hostile work environment sexual harassment claims, the MRS Defendants' motion for summary judgment is DENIED.  Because there is no such material dispute concerning whether Ms. Weir aided and abetted such conduct, Defendant Weir's motion for summary is GRANTED. An appropriate Order follows.


Date: September 9, 2015

                              s/Renée Marie Bumb
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE